In the Matter of THE UTICA NATIONAL BREWING COMPANY, a Dissolved Corporation.

ELLA M. WILLCOX, as Executrix of WILLIAM C. WILLCOX, Deceased, et al., Appellants; WILLIAM F. WELCH et al., Respondents.

1. PROMISSORY NOTES — RENEWAL. Whether the taking of a renewal note, by a bank, is in payment, or merely in extension, of the obligation represented by the previous note, depends upon the intention of the parties, as manifested by the facts and circumstances attending the transaction.

2. AVOIDANCE OF PRESUMPTION OF PAYMENT. A conclusive finding, that there was no intention on the part of any of the parties to renewal notes taken by a bank, or on the part of the bank, to pay the former notes, or that the taking of the new notes was to have the effect of such payment, but that, on the contrary, it was the intention of all parties to extend the time of payment of the former notes by renewals thereof, destroys whatever presumption of payment might arise from the taking of the renewal notes.

3. CONSOLIDATED CORPORATION — DISSOLUTION — LIABILITY FOR RENEWAL NOTE OF CONSTITUENT CORPORATION. Where, at the time of the consolidation of business corporations under the statute (L. 1892, ch. 691, § 8 *et seq.*), they are severally indebted to a bank upon promissory notes, and the notes mature and are renewed by notes of the same amounts and tenor after the consolidation, which new notes are held by the bank at the time of the commencement of a proceeding for the voluntary dissolution of the consolidated corporation, their payment as a claim against the consolidated corporation cannot be defeated on the ground that the taking of the renewal notes after the consolidation paid the notes which were outstanding against the constituent corporations at the time of their consolidation and discharged the consolidated corporation from its statutory liability for the payment of the debts of the constituent corporations, where it is established as a fact that the taking of the renewal notes was not intended by any of the parties to the notes or to the transaction as a payment, but merely as an extension, of the original obligations.

4. JUDGMENT AGAINST CONSTITUENT CORPORATION. Nor, in such case, does the fact that the creditor bank has reduced the liability of the constituent corporations, upon the notes held by it, to judgment discharge the consolidated corporation from its statutory liability for the payment of the debts of the constituent corporations.

5. CONCURRENT REMEDIES. Under the statute (L. 1892, ch. 691, § 12), the pursuit, by the creditor of a corporation which has entered into a

consolidation, of a remedy against his original debtor presents no legal obstacle to an effort to collect his debt from the consolidated corporation.

6. AGREEMENT BETWEEN CORPORATIONS — CREDITORS.   The statutory liability of a consolidated corporation for the debts and liabilities of its constituent corporations, cannot be impaired by any agreement between the corporations, as to creditors who have not joined in or assented to the agreement.

7. UNAUTHORIZED SALE OF TREASURY STOCK BY MANAGING STOCK-HOLDER — LIABILITY FOR PROCEEDS. . Where an agreement for the consolidation of corporations, under the statute, signed by all the stockholders, and providing for a distribution among them of the common stock and a portion of the preferred stock, provides that the rest of the preferred stock shall belong to the treasury of the consolidated corporation, to be disposed of only on the order of the board of directors, and one of the stockholders, having practical control of the consolidated corporation, sells some of its treasury stock without any resolution of the directors authorizing it, and pays a part of the proceeds over to the corporation, the payment may be deemed a recognition by him of a liability to account for the proceeds of all the treasury stock so sold by him, and warrants the setting off of the balance of such proceeds against a note made by one of the constituent corporations, held by him.

8. AGREEMENT AS TO CORPORATE DEBTS — STOCKHOLDERS.   A provision in an agreement for the consolidation of corporations, under the statute, signed by the stockholders, to the effect that the consolidated corporation shall owe no debts on account of the constituent corporations, while it cannot affect the rights of outside creditors is a bar to the claim of a signing stockholder to payment from the assets of the consolidated corporation, in case of its insolvency, of an obligation of a constituent corporation held by him.

*Matter of Utica National Brewing Co.*, 19 App. Div. 627, affirmed.

(Argued October 18, 1897; decided November 23, 1897.)

APPEAL from an order of the Appellate Division of the Supreme Court in the fourth judicial department, entered June 28, 1897, which affirmed an order of Special Term confirming the report of a referee appointed to pass upon the final account of the receiver of an insolvent corporation, and to take evidence and report as to certain disputed claims.

The facts, so far as material, are stated in the opinion.

*P. C. J. De Angelis* for appellants.   Upon the assumption that the indebtedness held by Mr. Welch as assignee is an indebtedness of the new corporation, we insist that the claim

of the executrix should be allowed, both upon the $6,000 note and upon the account. (*P. Ins. Co.* v. *Church*, 81 N. Y. 218.)

*William Kernan* for respondents. The report of the referee, and the order confirming the same, are *res adjudicata* as to the validity of the claim of the First National Bank, assigned to Welch. (*Harris* v. *Harris*, 36 Barb. 88; *Lythgoe* v. *Lythgoe*, 75 Hun, 147; *Clemens* v. *Clemens*, 37 N. Y. 59; *Dolan* v. *Mayor, etc.*, 62 N. Y. 472; *C. P. P. & M. Co.* v. *Walker*, 114 N. Y. 7; *Demarest* v. *Darg*, 32 N. Y. 281; *Aldridge* v. *Walker*, 73 Hun, 281; *Milbank* v. *Jones*, 2 Misc. Rep. 503; *McRoberts* v. *Pooley*, 12 Civ. Pro. Rep. 139; *Dwight* v. *St. John*, 25 N. Y. 203; *Leavitt* v. *Wolcott*, 95 N. Y. 212; *Culross* v. *Gibbons*, 130 N. Y. 447.) The taking by the bank of renewal notes from the old companies subsequent to the consolidation in no way affected the debt of the bank, either against the old or the new companies. (Edwards on Bills & Prom. Notes, 192, 193; *First Nat. Bank* v. *Morgan*, 6 Hun, 346; *H. T. Co.* v. *Waddell*, 75 Hun, 104, 113; *Bates* v. *Rosekrans*, 37 N. Y. 410; *Winsted Bank* v. *Webb*, 39 N. Y. 325; *Claflin* v. *Ostrom*, 54 N. Y. 582; *J. I. Co.* v. *Walker*, 76 N. Y. 521; *Nat. Bank of Newburgh* v. *Bigler*, 83 N. Y. 52.) The judgments obtained by the bank against the old companies upon the notes in no way affected the bank's rights as creditor against the new company. (L. 1892, ch. 691, § 12; *Prouty* v. *L. S. & M. S. R. Co.*, 52 N. Y. 363; *Boardman* v. *L. S. & M. S. R. Co.*, 84 N. Y. 157; *Gambling* v. *Haight*, 59 N. Y. 354; *R. & E. M. Co.* v. *Carpenter*, 5 Hun, 162; *C. E. Ins. Co.* v. *Babcock*, 57 Barb. 231; *F. Nat. Bank* v. *Morgan*, 6 Hun, 346.) The referee was right in disallowing the claim of the estate of William C. Willcox. (Bigelow on Est. [4th ed.] 558; *Smith* v. *Felton*, 43 N. Y. 419; *Davidson* v. *Alfaro*, 80 N. Y. 660; *Coffin* v. *McLean*, 80 N. Y. 560; *Littlefield* v. *Albany Co. Bank*, 97 N. Y. 581; *Acer* v. *Hotchkiss*, 97 N. Y. 395, 408; *Wood* v. *Livingston*, 11 Johns. 36.) If the estate of Willcox and the executrix thereof are not barred and estopped by the said consolidation

agreement from claiming this note for $6,000 and interest, still they are not entitled to anything on such note or on the account of the said Willcox on the books of the company. (Code Civ. Pro. § 505 ; *Mowry* v. *Peet,* 13 Wkly. Dig. 16 ; *Smith* v. *Felton,* 43 N. Y. 419 ; *Hughitt* v. *Hayes,* 136 N. Y. 163.)

GRAY, J.   Upon the final accounting of the receiver of the Utica National Brewing Company, it was referred to a referee to report as to certain disputed claims, among other things, and this appeal brings up for our review the correctness of his report as to the claims presented by the First National Bank of Utica and by the estate of William C. Willcox, deceased. The first of these claims was allowed by the referee ; but the other he disallowed and his disposition of both has been approved by the courts below.   The executrix of William C. Willcox now appeals to this court from the disposition so made.

The Utica National Brewing Company was formed in May, 1893, by the consolidation of two corporations, known as the National Brewing Company and the Utica Brewing Company.   At the time of this consolidation, these companies were indebted to the First National Bank of Utica upon several promissory notes, payable to the order of William C. Willcox and indorsed by him, aggregating in amount the sum of $47,962.   These notes severally matured subsequent to the consolidation ; but they were renewed, some two and some three times, by the giving of new notes for the same amount and of like tenor.   These renewal notes were held by the bank at the time when this proceeding for the voluntary dissolution of the new company was commenced.   Subsequently, the bank recovered judgments against each of the two companies upon the notes it held and it has assigned its claim against the estate in the hands of the receiver of the new company to William F. Welch, respondent here.

The objection was made to the claim of the bank, as presented to the receiver, that the taking of the renewal notes,

after the consolidation was effected, and the incidental trans-
actions connected therewith, and the reduction to judgment
against the consolidating companies of their liability upon the
notes constituted, in legal effect, a discharge of the consoli-
dated company from its statutory liability for the payment of
the debts of those companies.    It was claimed that the notes
which were outstanding against the constituent companies, at
the time of their consolidation, were in fact paid.

Whether the taking of the renewal notes was in payment,
or in discharge, of the obligation represented by the previous
notes was a question to be answered by ascertaining the inten-
tion of the parties, as manifested by the facts and circum-
stances attending their transactions, and we have an explicit
finding of fact by the referee upon the subject.    He found
that there was no intention on the part of the makers or
indorsers of said notes, or on the part of the bank, to pay the
former notes, or that the taking of said new notes was to have
the effect of such payment; but that, on the contrary, it was
the intention of all the parties to extend the time of payment
of said notes by renewals thereof.    His finding is supported by
the evidence and, with the unanimous affirmance by the
Appellate Division, now becomes conclusive upon the ques-
tion.    It destroys whatever presumption of payment might
arise from the taking of the renewal notes.    (*National Bank
of Newburgh* v. *Bigler*, 83 N. Y. 51.)    The operation of the
renewal notes was. to further extend the time of payment of
the obligation and to evidence its continued existence.    The
evidence must be regarded as having negatived the idea of any
agreement that the new promises to pay should be equivalent
to payment.    (*Jagger Iron Co.* v. *Walker*, 76 N. Y. 521.)
The *Phœnix Insurance Co.'s Case* (81 N. Y. 218), does not
deny the general rule.    In the opinion it is observed, but only
in passing, that by common understanding and usage the
transaction of discounting a note, to take up a prior note held
by the bank, and the crediting of the avails to the party,
might be regarded as an extinguishment of the prior note.
There is no such element of usage here.

Nor did the recovery of the judgments upon the notes affect the creditor's rights against the new company. Their effect was, simply, to effect a change in the form of its liability to its creditor. It was open to the creditor, under the provisions of the statute, pursuant to which the consolidation of the companies was effected, (Chap. 691, Laws of 1892), to enforce the liability, either against the corporation whose debt it was, or against the new corporation whose debt it became under the statute, which made it liable to pay and discharge all the liabilities of each of the corporations consolidated. (Sec. 12.) The very purpose of this statute, while permitting companies to consolidate themselves into a single corporation, was to preserve to the creditor all his rights, unimpaired by what was done, and its operation is to furnish to him remedies, necessarily, concurrent in their nature. The creditor's pursuit of a remedy against his original debtor presents no legal obstacle to his effort to collect his debt from the new company.

It is argued, however, in effect, that by the terms of the consolidation agreement the new corporation was freed from the debts and liabilities of the corporations merging into it. If we might assume that such was intended as a result of consolidation under the agreement, nevertheless, it would be wholly inoperative to accomplish any such thing as to creditors who were not parties to the agreement. Such creditors were not bound by any of its provisions. The statute protected them and consolidation pursuant to its permission and provisions, whatever it may mean for the stockholders because of their agreement, leaves the creditors precisely in the situation which the statute defines. If they have not done anything to impair or to release their rights, it is not, and could not be, within the purview of the statute that those rights may be impaired through the action of members of the consolidating corporations.

The suggestion that the bank here was chargeable with knowledge as to what the arrangement was for the consolidation of the companies, and, therefore, that it could not, in good

faith, assert its claim against the new company, is without any force or reason, in our judgment, and needs no discussion.

The claim presented by the executrix of William C. Willcox against the estate in the hands of the receiver, so far as this appeal is concerned, is founded upon a promissory note, made by the National Brewing Company in June, 1893, to the order of William C. Willcox for $6,000 and interest. Objection was made to this claim, and it is argued that, as a debt of one of the constituent companies of which Willcox was president and a stockholder and a director, it was discharged by virtue of that clause of the consolidation agreement which provided, among other things, that the property and stock of the constituent companies should be transferred to the new company and be owned by it, "free and clear from all incumbrances, equities or debts, and that the said consolidated corporation should at its inception owe no debts for or on account of any of the business or property of the said constituent companies." The operation of this provision, it was argued, was that the stockholders who signed the agreement of consolidation became personally answerable to indemnify the consolidated company against the liabilities of the constituent companies.

The consolidation agreement is clumsily expressed, and its meaning is not altogether clear; but we are concerned rather with its effect upon the claim in question and not with the question of whether it militates against any purpose of the statute. It purports to be the agreement of the stockholders, as well as of the directors, and it appears that the latter were the owners of all of the stock of the consolidating companies. While it provides that of the $160,000 of capital stock of the new company, $80,000 is to be paid to each company, this general provision is subsequently qualified by the definition of the manner of distribution of the new capital. It is divided into $60,000 of preferred stock and $100,000 of common stock. The common stock is to be distributed wholly among certain named subscribers (who are, in fact, the old directors and stockholders), and of the preferred stock $20,000 is to be distributed to certain two of those parties, Willcox and

McNeirney, as subscribers, who took each $10,000; leaving, to quote from the agreement, "unsubscribed for $40,000, which shall belong in the treasury of the said consolidated corporation and shall be offered, sold or disposed of, at not less than cost, according to the direction and order of the said board of directors." That only $120,000, in amount, of the new capitalization was to be allotted to the persons who composed the body of the former stockholders, is made evident by a later clause, which provides that the subscriptions for "$100,000, the full amount of the common stock of said company, and $20,000 of said * * * preferred stock, shall be hereby made and subscribed as cash subscriptions," etc.

It may be inferred from this agreement that the stockholders of the constituent companies devised a scheme or transaction for a division among themselves of $120,000 of the stock of the new corporation and that it was proposed by the sale of $40,000, in amount, of preferred stock to furnish the treasury of the corporation with a working capital. It was evidently not intended that the new company should be put in possession of funds from the subscriptions for the $100,000 of common stock and the $20,000 of preferred stock; inasmuch as by a peculiar, and not very intelligible provision, of the agreement the new company was to pay for the property transferred, in cash or by its check, "to each of said parties for the amount of their respective shares or considerations and that thereby the said subscriptions unto the said capital stock, etc., shall be hereby made as cash subscriptions." It is immaterial to the present discussion that the subscribers to the common stock and to the $20,000 of preferred stock were not to make any actual payment of money into the company's treasury, or that there was a contrivance to make it appear that there was a purchase of corporate properties, at a certain figure of valuation, without any money actually passing. The fact is that $40,000 of preferred stock was to belong to the new treasury, to be disposed of only according to the order of the board of directors. Now the finding of the referee is that Willcox sold preferred stock in the treasury of

the new company to an amount equal to $17,766.66, without any resolution of the board of directors directing the same, and that, being practically in control of the company, he had assumed the responsibility of issuing that amount of stock. Of the proceeds of the sales of the preferred stock, he paid into the company and received credit for, by his own direction, the sum of $8,100. The referee construed Willcox's conduct, in thus turning the proceeds of the sale of the stock into the company, as implying the right of the company to them, and he held that he should account for the whole of the sale as the property of the company. This view resulted in the surcharging of Willcox's account upon the company's books with the $17,666.66 and in leaving a balance due from him of upwards of $9,000, or more than enough to extinguish the amount claimed by his executrix upon the note for $6,000. The referee's ground for disallowance of the Willcox claim is, in our judgment, perfectly sound. Willcox could not dispose of the treasury stock, in the absence of some warrant from the board of directors, without rendering himself liable to account for the proceeds, and this liability seems to have been fully recognized by him in his direction that his account should be credited with that portion of the proceeds which he had paid in.

There is another view of the case, which militates against this claim, and that is that, under the circumstances, Willcox would have been, and his estate is, barred from collecting it from the new corporation. He was a party to the agreement of consolidation, not merely as a director of the constituent companies, but also as a stockholder, and one of the clauses provided, as it has been above mentioned, that the new company should owe no debts on account of any of the business of the constituent companies. This was, in effect, the agreement of the parties who were organizing the consolidated company, and who were to receive all the benefits which consolidation might bring, that the new company should owe no debts on account of the old corporations. It amounted to an agreement of indemnity on their part, and Willcox

was bound by it, quite as much as though he had been a party to it merely in his individual capacity. In the consolidation of corporations, pursuant to the provisions of the statute, the new corporation starts upon its existence freighted with the liabilities of the old companies and subject to the terms and conditions of the consolidation agreement, so far as they are not in conflict with the law. While it is not competent to do anything which would impair the rights of outside creditors, there is no reason why the parties to the consolidation agreement may not bind themselves to something deemed for the benefit of the new corporation, and that is what seems to have been done in the present case. The manifest intention of the stockholders of the old companies, who united in making and signing the consolidation agreement, seems to have been to represent that their corporate properties and franchises vested in the new company freed from any burden of indebtedness. As to creditors not assenting to any such arrangement, this was quite unavailing; but as to themselves it should, and would, operate to bar their claims, while the other creditors were seeking payment from the assets of the corporation since become insolvent. The appellant cannot be heard to complain of the justice of this reading of the representation in the consolidation agreement.

Upon all of the grounds discussed in this opinion, the order appealed from should be affirmed, with costs.

All concur.

Order affirmed.